UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEIL MILLER,<br>  Plaintiff<br><br>   v.<br><br>CITY OF BOSTON; MARGOT HILL, in her<br>individual capacity; DAVID L. BRODY,<br>senior criminalist, in his individual capacity;<br>JOSEPH PISHKIN, in his individual capacity;<br>JOHN DOE and JANE DOE, supervisors in<br>the Boston Police Department, in their<br>individual capacities; CHARLES DALY,<br>in his individual capacity; SUFFOLK<br>COUNTY; and SUFFOLK COUNTY<br>DISTRICT ATTORNEY'S OFFICE,<br>  Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 03-10805-JLT<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT AND JURY DEMAND

## INTRODUCTION

1. Plaintiff Neil Miller was imprisoned for more than a decade—thirteen months in pre-trial detention and nine and a half years in various Massachusetts state prisons—for breaking and entering, robbery and rape, all crimes he did not commit. DNA testing of the rape kit and the semen-stained sheet finally produced indisputable evidence that exonerated Mr. Miller and identified the real perpetrator. Mr. Miller's conviction was vacated, the indictment dismissed. On May 10, 2000, the court proclaimed his innocence.

2. Mr. Miller's wrongful conviction was not a calamitous accident. It resulted from unconstitutional and tortious efforts by the defendant police officers, a state-employed serologist, and their respective supervisors; and it came of municipal policies and customs and practices deliberately indifferent to civil rights. Despite Mr. Miller's innocence and the utter lack of evidence against him, at each step of the criminal process the defendants used unconstitutional investigative techniques that caused Mr. Miller's arrest, unfair trial, conviction, and lengthy imprisonment.

3. Acting under color of law, the defendants applied irreparably suggestive identification procedures that led the rape victim to identify Mr. Miller falsely; they fabricated evidence to neutralize presumptively exculpatory evidence; they manufactured falsely inculpatory serology results that scientific methodology could not have rendered and that flatly contradicted the data; and they failed to investigate an obvious lead that would have completely exculpated Mr. Miller before trial.

4. Beyond compensating Mr. Miller for the years stolen from him and for his continuing injuries, this action seeks to redress the unlawful municipal policies and practices pursuant to which the defendants, acting under color of law, violated his clearly established rights as guaranteed by the Fourth, Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.

## JURISDICTION

5.  Title 28 U.S.C. § 1331 provides federal question jurisdiction, and 28 U.S.C. § 1367 provides supplemental jurisdiction over the state law claims.

## VENUE

6.  Pursuant to 28 U.S.C. § 1391(b), venue is proper in the District of Massachusetts, the judicial district in which the claim arose and in which, upon information and belief, all defendants reside or conduct business.

## PARTIES

7.  Plaintiff NEIL MILLER is, and at all times relevant herein was, an individual residing in Boston, Massachusetts.

8.  Defendant CITY OF BOSTON is a duly organized municipal corporation under the laws of the Commonwealth of Massachusetts. At all times relevant to this action, the BOSTON POLICE DEPARTMENT, including its crime laboratory, was a department within the City of Boston.

9.  Defendant MARGOT HILL, at all times relevant to this action, was a member of the Boston Police Department. Her actions alleged in this complaint were taken under color of the laws of the Commonwealth of Massachusetts and the City of Boston. She is sued in her individual capacity.

10. Defendant DAVID L. BRODY, at all times relevant to this action, was a senior criminalist working for the Boston Police Department's crime laboratory. His actions

3

alleged in this complaint were taken under color of the laws of the Commonwealth of Massachusetts and the City of Boston. He is sued in his individual capacity.

11. Defendant JOSEPH PISHKIN, at all times relevant to this action, was a member of the Boston Police Department. His actions alleged in this complaint were taken under color of the laws of the Commonwealth of Massachusetts and the City of Boston. He is sued in his individual capacity.

12. Defendants JOHN DOE and JANE DOE, whose identities are currently unknown, represent those employees of the Boston Police Department with supervisory authority over defendants MARGOT HILL, DAVID BRODY, and JOSEPH PISHKIN. Their actions alleged in this complaint were taken under color of the laws of the Commonwealth of Massachusetts and the City of Boston. They are sued in their individual capacities.

13. Defendant CHARLES DALY was, at all times relevant to this action, an assistant district attorney with the Suffolk County District Attorney's Office. His actions alleged in this complaint were taken under color of the laws of the Commonwealth of Massachusetts and Suffolk County. He is sued in his individual capacity.

14. Defendant SUFFOLK COUNTY is a duly designated county in the Commonwealth of Massachusetts under the laws of the Commonwealth of Massachusetts.

15. Defendant SUFFOLK COUNTY DISTRICT ATTORNEY'S OFFICE is a duly designated local governmental entity in the Commonwealth of Massachusetts.

4

## JURY TRIAL DEMAND

16.    Mr. Miller hereby demands a trial by jury on all issues so triable.

## FACTS

### The Crime

17.    On the morning of August 24, 1989, Joan Roe, a white undergraduate student at Emerson College, was raped and robbed in her apartment by a black man whom she had never seen before.

18.    The man pushed his way into the apartment, threatening Ms. Roe with a screwdriver.

19.    Ms. Roe shared this apartment with a roommate, Julie Jones, but Ms. Jones was not at home at the time of the crime.

20.    The assailant led Ms. Roe into Ms. Jones's bedroom. There he rummaged through Ms. Jones's belongings, putting aside items to steal. Then he pushed Ms. Roe down onto the white fitted sheet of Ms. Jones's unmade bed, lay down on top of her, and forced her into genital intercourse.

21.    After the rape, the assailant marched Ms. Roe through the apartment to assemble other things he wanted to steal. Then he took her back to Ms. Jones's bed for a second genital rape; he also forced her into oral copulation. Before departing, the assailant ripped the telephones out of the wall.

## The False Identification of Mr. Miller

22.  Ms. Roe called a rape crisis center and was referred to Beth Israel Hospital. The hospital summoned the police, physically examined and interviewed Ms. Roe, and prepared a rape kit. Among the items included in the rape kit were swabbings of biological fluids collected from the victim's mouth and vagina.

23.  Defendant Hill, a detective from the Boston Police Sexual Assault Unit, was assigned to the case. Ms. Roe's initial description of the perpetrator, provided to Defendant Hill at the hospital, was of a 5' 10", 160-pound black man with a thin build, brown (as opposed to black) hair, a short afro, brown eyes, and a mustache.

24.  After interviewing Ms. Roe, Defendant Hill went to Ms. Roe's apartment and collected evidence, including Ms. Jones' fitted bedsheet, which had more than one noticeable yellowish stain.

25.  During the crime scene examination, latent fingerprints were lifted from objects and surfaces that Ms. Roe said had been touched by the rapist. None of these fingerprints matched Mr. Miller.

26.  The next day, Ms. Roe and her parents visited the Area B-2 police station in Roxbury where Detective Ingersoll showed her six photo books. Each book contained photographs of approximately one hundred black men. After viewing the six hundred or so photos, Ms. Roe failed to make a positive identification. At Detective Ingersoll's

urging, she pulled out some "similars." On information and belief, Mr. Miller's photo was included in one of the six books.

27. Ms. Roe left Boston for a couple of weeks. On September 17, 1989, before her return, Defendant Hill dropped off with Ms. Roe's roommate another book of one hundred photos. Ms. Roe viewed them on her own and later discussed them with Defendant Hill. Once again, Ms. Roe failed to make an identification.

28. On September 18, 1989, twenty-five days after the rape, Defendant Hill brought Ms. Roe to a Boston Police Department artist who worked with her to prepare a composite sketch. After the sketch was completed, on information and belief, Ms. Roe was given a photocopy to take home and refer to freely.

29. Later that day, Defendant Hill showed the sketch to fellow officers James Powers and Freddy Waggert. One of the officers told Defendant Hill that the sketch resembled a young man named Neil Miller with whom the officers had had a recent encounter that did not result in an arrest.

30. Defendant Hill followed her fellow officers' suggestion and checked the Field Interrogation and Observation (FIO) files, where she learned that, although Mr. Miller had had two minor encounters with the police, he had no background whatsoever in sexual assaults. Defendant Hill pulled a six-year-old photo of Mr. Miller, taken when he was a juvenile (age 16), and included it in an array of ten to twelve photos to show

to Ms. Roe. A more recent photograph of Mr. Miller was available when Defendant Hill pulled the six-year-old photo.

31. On September 22, 1989, Defendant Hill went to Ms. Roe's apartment and laid the group of photos out on the table for Ms. Roe's inspection. Ms. Roe picked two photos about which she felt very strongly. The first photo she selected was the one of Mr. Miller as a teenager. The second photo was of a different man.

32. Knowing that Ms. Roe selected Mr. Miller's picture first, Defendant Hill then put the following question and comment to Ms. Roe: "I asked her which photo she felt most strongly about, and if she had a first impression, that *the best thing to do was go with her first impression.*" 12/17/90 Trial Transcript, Volume II, at 72 (emphasis added). Ms. Roe complied. She picked up the photograph that had been her first impression: Mr. Miller's.

33. This first photo array was unduly suggestive.

34. On the basis of that suggestive identification, a warrant was issued for Mr. Miller's arrest. When he was arrested on November 15, 1989, a new photograph was taken. On information and belief, Mr. Miller, as he appeared that day in November 1989, bore only a minimal resemblance to Ms. Roe's first description or to the composite sketch. Moreover, Mr. Miller's appearance as he approached his twenty-third birthday in November 1989 was completely different from the way he looked in the photo taken when he was sixteen.

35. On November 22, 1989, Defendant Hill brought to Ms. Roe's apartment a new ten-photo array that included the November 15 arrest photo of Mr. Miller. Although Defendant Hill proclaimed that Mr. Miller's "features had changed dramatically" from the earlier photo (November 7, 1990 <u>Wade</u> hearing at 62), Ms. Roe nevertheless selected the new photo of Neil Miller as that of the rapist.

36. On information and belief, this second identification procedure was unduly suggestive.

37. On information and belief, at some point after Mr. Miller's arrest but before Ms. Roe testified at trial, Defendant Hill further engaged in improper conduct to convince Ms. Roe she had identified the right man, including falsely telling her that Mr. Miller was a bad person who had raped a ninety year-old woman.

38. The case was calendared for a probable cause hearing on February 27, 1990. At the first call of the case, Mr. Miller's lawyer, William Talley Jr. of the Committee for Public Counsel Services, informed defendant assistant district attorney Charles Daly that, since the identity of the perpetrator was a critical issue in the case, he was requesting that Mr. Miller be kept out of the courtroom during the probable cause hearing so that a non-suggestive identification procedure could be arranged for a later date. Defendant Daly indicated to Mr. Talley that the victim was being kept upstairs in the district attorney's office until the hearing took place.

39. Before the second call of the case, Defendant Daly and defendant Detective Joseph Pishkin deliberately ignored the specific pending application of Mr. Miller's counsel to avoid another suggestive identification and to obtain a properly conducted lineup procedure. They had learned from Mr. Talley that Mr. Miller was waiting in a downstairs hallway outside the Second Session courtroom. Defendant Daly told Ms. Roe that he and Defendant Pishkin would accompany her downstairs and, if she saw the man who had raped her, that she should identify him. (Obviously, Ms. Roe was being directed to a man whose *photo* she had previously selected.)

40. Defendant Pishkin walked downstairs next to Ms. Roe. When she saw two men outside the Second Session court, she told Defendant Pishkin that she thought one of the men was her assailant. That man walked into the almost empty courtroom—the judge was not on the bench—and sat down. Ms. Roe walked into the courtroom and approached Mr. Miller, who sat alone on a bench, and identified him to Defendant Pishkin as her rapist.

41. These unduly suggestive corporeal identifications outside and inside the courtroom—conducted before the defense hearing that sought a non-suggestive line-up procedure—were unconstitutional acts that rendered pointless defense counsel's application for a non-suggestive lineup procedure.

42. At the subsequent hearing on Mr. Miller's motion to suppress both the hallway identification and the in-court identification, the prosecutor conceded that Mr.

Miller's Sixth Amendment right to counsel had been violated by the police-orchestrated hallway identification. The trial court suppressed the hallway identification but nevertheless permitted Ms. Roe to identify Mr. Miller at trial.

## The Forensic Investigation

43.     On August 28, 1989, Defendant Hill submitted Ms. Roe's clothing and the white fitted sheet to the Boston Police Crime Laboratory. On August 31, Defendant Hill dropped off the rape kit. The police assigned the case to defendant Senior Criminalist David Brody.

44.     Although forensic DNA testing was available, it was not being used routinely by the Boston Police Crime Laboratory in 1989. Instead of DNA typing, Defendant Brody used the ABO and PGM genetic marker systems to examine the evidence.

45.     Defendant Brody examined and tested the evidence without first getting a reference sample from Mr. Miller. In his report, Defendant Brody stated:

> ITEM 7—Off white fitted double sheet. There are several large yellowish stains. Semen and the "B" and "H" blood group substances were identified in the stains.
> ITEM 10—One rape kit containing the following:
>     A.    Four smear slides (2 vaginal, 2 oral). No sperm was microscopically observed on either oral slide. A few sperm was microscopically observed on both vaginal smear slides.
>     B.    Six swabs (2 oral, 2 vaginal, 2 genital). Semen was not identified on the oral swabs. Semen and the "H" blood group substance was identified on both of the vaginal and genital swabs. Sperm was also

        microscopically observed on one of the genital swabs.

C.    A sample of the victim's blood. Tests showed the victim to be a Group "O" secretor.

D.    Pubic hair combings and pubic hair standard. The pubic hair combings contained 6 hairs of causasian origin that were microscopically similar to the victim's pubic hair standard.

46.    After the report was prepared, Defendant Brody obtained Mr. Miller's blood and saliva on October 31, 1990, and an additional blood sample from Ms. Roe. Defendant Brody published the results in a supplemental report that found that Mr. Miller was a Group "O" secretor, PGM 1; and Ms. Roe was a Group "O" secretor, PGM 2-1. But reportedly PGM was detected neither among the vaginal and genital swabs nor on the sheet.

47.    There are four "ABO" blood types: "A", "B", "AB", and "O." "H" blood group substance is the oldest and is present in all four blood types. If a person is type "A," he will have "A" and "H" blood group substances; if type "B," then "B" and "H" blood group substances; and if type "AB," then "A," "B," and "H" blood group substances. If he has only "H" present, then he is blood type "O." Approximately 80% of the population secretes its blood type in its other bodily fluids, such as semen, saliva, and vaginal secretions. If a blood type is identified in a person's secretion, then he is labeled a "secretor."

48. Based on Defendant Brody's serology work in this case, Mr. Miller was presumptively excluded as the rapist because the semen that the rapist deposited on the fitted sheet came from a "B" secretor whereas Mr. Miller was an "O" secretor. But Defendant Brody withheld this conclusion from the District Attorney's office and the defense.

49. On information and belief, before trial, Defendant Hill falsely represented to the prosecutor and to Mr. Miller's counsel that the semen stains on the fitted sheet were deposited by a male friend of Ms. Roe's roommate. There was no evidence of any kind pointing to the existence of such a male friend as the source of the semen stains. In fact, Defendant Hill and the other Boston police officers failed to investigate that hypothesis: they failed to seek out, as reasonable officers would do, the identity of any putative male visitor and to conduct elimination blood group testing on him and on the roommate in order to exclude them as sources of the stains.

50. Recent DNA testing proved dispositively that the man who raped Ms. Roe also deposited the semen stains on the fitted sheet. The DNA profile on the sperm portion of the vaginal swabs and the DNA profile on the semen stains found on the sheet were identical. The police failed to disclose to Mr. Miller or his counsel the exculpatory fact that they had no evidence that the semen on the sheet came from anyone other than the rapist. In fact the police did exactly the opposite, alleging falsely that the stains on the sheet were unrelated to the rape.

51. Further, they alleged that the "O" type on the vaginal swabs was deposited by the semen donor exclusively. Defendant Brody's fabricated report claimed that "Semen and the 'H' blood group substance was [sic] identified on both of the vaginal and genital swabs" without mentioning the fact that the swabs contained the victim's biological material in far greater concentration than the semen. Defendant Brody's report recklessly omitted that the "H" blood group substance could have originated exclusively from the female and that the age and condition of the specimens may have prevented typing of the less concentrated semen. Defendant Brody knew that the vaginal and genital swabs contained mixtures of semen and the victim's own bodily fluids. The only "ABO" antigen he observed in the vaginal and genital swabs—"H"—was consistent with having come exclusively from the victim, who was also an "O" secretor. Every competent serologist in the nation knew that national standards in the field prohibited speculation concerning the "ABO" type of a semen donor when the only "ABO" antigen observed was consistent with the victim's. Thus, Defendant Brody knew that the results from the swabs were totally uninformative and absent probative value.

52. Nevertheless, Defendant Brody falsely communicated to the prosecutor that the serological results on the swabs were consistent with Mr. Miller's being the rapist. He failed to disclose to the prosecutor and the defense that the "H" blood group observed could have come exclusively from the victim's vaginal secretions. Instead, he

14

informed the prosecutor before trial, and testified subsequently at trial, that it was either all semen or a mixture of semen and vaginal secretions. This, too, was false.

53. On information and belief, Defendant Brody communicated to the prosecutor the statistics that only 40% of the population is type "O" and that only 80% to 85% of type "O" people are secretors.

54. On information and belief, Defendant Brody falsely communicated to the prosecutor that, because of those statistics, the testing excluded more than half the population. This was a fabrication since, as the swab results were uninformative, 100% of the male population could have contributed to the mixture on the swabs.

55. The prosecutor exploited the fabricated evidence in her summation. Based upon Defendant Brody's misrepresentations, prosecutor Leslie O'Brien argued to the jury that the semen sample on the vaginal swab came from an "O" secretor and that one-half the male population could be excluded as potential donors.

56. Defendant Brody prevented the defense from presenting powerful impeachment against him by failing to disclose that the serological evidence was exculpatory or, even if one were to ignore the fitted sheet, at least not at all inculpatory.

## Trial, Conviction, Incarceration, and Exoneration

57. The primary evidence presented against Mr. Miller was Ms. Roe's testimony (including her in-court and photo identifications), Defendant Hill's corroboration of the identifications, and Defendant Brody's serology results.

58. In December 1990, the jury convicted Mr. Miller of forcible copulation, forcible rape, breaking and entering, and robbery. He was sentenced to prison for ten to twenty-five years.

59. After Mr. Miller's direct appeals were denied, he contacted the Innocence Project of the Benjamin N. Cardozo Law School, which represented him.

60. Eventually, District Attorney Ralph Martin II consented to the request of the Innocence Project for post-conviction DNA testing.

61. DNA testing results published in April 2000, conducted by Dr. Edward Blake of Forensic Science Associates, revealed that both the semen on the sheet and on the vaginal and genital swabs originated from the same man—and that the rapist was not Neil Miller. See DNA Report, attached as Exhibit 1.

62. On May 10, 2000, Mr. Miller's conviction was vacated and the indictment dismissed on the grounds of actual innocence. The prosecutor joined in the motion filed by the defense. That day, Mr. Miller was released. He had spent ten and a half years imprisoned for crimes he did not commit.

63. After Mr. Miller's exoneration, the DNA profile of the real perpetrator, derived from the sheet stains and vaginal swabs, was run against the database of convicted offenders. The database scored a hit, identifying a man imprisoned in Massachusetts on a burglary conviction.

64. On information and belief, the profile also matched the semen evidence collected from two unsolved rapes that were committed *after* the rape of Ms. Roe. The deliberate indifference of Defendants Brody, Hill, Pishkin, and Daly made it possible for the real perpetrator to rape two more women.

## The City of Boston's Indifference and Acquiescence to Police Misconduct

65. By the time of Mr. Miller's arrest, policymakers for the Boston Police Department were on notice of misconduct by Boston police officers including officers' providing false testimony, filing false affidavits in support of search warrants, and inadequately investigating cases. Although this misconduct deprived people of their constitutional rights, the policymakers for the Boston Police Department neither required its officers to comply with the law nor punished them when they did not comply.

66. At the time of Mr. Miller's arrest, the Boston Police Department did not have a properly functioning system of internal discipline. The police department was such a public disgrace that Mayor Flynn appointed a management review committee headed by attorney James D. St. Clair to review the department. The committee issued its report on January 14, 1992, finding wide-ranging problems with the internal disciplinary system. Examples of the systemic failures at the time of the crime against Ms. Roe are described below.

67. In 1988, Boston police officers beat John J. Smith while other officers and civilians watched. The BPD's internal investigation unit was unable to identify the officers.

Later the state attorney general succeeded in identifying them and obtained an injunction against the officers under the state civil rights statute.

68.   The investigation of Ms. Roe's rape took place at a time when the Boston Police Department was so poorly managed that police officers felt free to use false statements in search warrants and to coerce witnesses to lie in support of arrests. In February 1989, criminal defense attorneys in <u>Commonwealth v. Lewin</u> revealed that police officers in the Drug Control Unit lied in affidavits to obtain search warrants.

69.   In September 1989, Boston police officers charged Gary Willoughby with homicide. He was acquitted of all charges in 1990 after an officer perjured himself during the trial. Mr. Willoughby sued and was compensated for the wrongful actions of the Boston police officers. The officer was not disciplined.

70.   In 1989, a Boston police officer falsely testified to a grand jury that he saw a gun hidden on a second floor landing. The judge in <u>Commonwealth v. Phillips</u> found that the officer would have had to be "30 feet tall" for his testimony to be true. Only then did the officer admit that his testimony was false. Though the charges against the defendant were dismissed, the police officer was not disciplined.

71.   Also in 1989, Marvin Mitchell was charged with rape even though he did not fit the description given by the victim. Two Boston police officers falsely testified that Mr. Mitchell had admitted to wearing unusual clothing described by the victim. After

spending over seven years in prison, Mr. Mitchell was exonerated in April 1997 through DNA testing. The Boston police officers were not disciplined.

72. On October 23, 1989, just two months after Ms. Roe was raped, Carol Stuart was murdered in Boston. Her husband, Charles, told officers that a black man fired the shot. Boston police officers focused their murder investigation on an African-American named Willie Bennett. But only after Mr. Stuart committed suicide and evidence arose showing that he was the murderer did the investigators end their pursuit of Mr. Bennett. The United States Attorney for the District of Massachusetts investigated this criminal investigation. In a report dated July 10, 1991, the United States Attorney found that Boston police officers engaged in the following conduct to incriminate Mr. Bennett:

A. Forcing witnesses to give false statements incriminating Mr. Bennett;

B. Pressuring witnesses to give false testimony incriminating Mr. Bennett to a Suffolk County grand jury investigating the murder; and

C. Pressuring witnesses to give false information that was used to obtain search warrants.

73. The policymaker for the Boston Police Department, Boston Police Commissioner Francis Roache, was on notice that Boston police officers felt free to falsify affidavits in support of search warrants and to testify falsely to grand juries and at criminal trials before the incidents leading to the wrongful arrest and conviction of Mr. Miller.

19

74. Despite knowledge that Boston police officers felt free to circumvent the law to secure convictions, the Boston Police Department:

   A. Failed to require an adequate standard of investigation by its detectives;

   B. Failed to properly supervise and review the method and process of criminal investigations; and

   C. Failed to discipline Boston police officers for giving false testimony.

75. The Boston Police Department failed to hold its officers to an ethical standard. This created an environment in which officers like Defendant Hill felt free to conduct a suggestive identification and to misrepresent facts in order to obtain a conviction because she knew this conduct would not result in punishment. The Boston Police Department allowed its officers to feel that convicting someone, anyone, for a crime was more important than making sure that the person charged with the crime was the true culprit.

## The Suffolk County District Attorney's Failure to Properly Train Staff

76. Defendants Suffolk County and the Suffolk County District Attorney's Office, acting through their policymakers, created and maintained a policy, custom, or practice of failing to train and supervise their employees and agents, including Defendant Daly, in conducting constitutionally adequate identification procedures and in ensuring that unreliable, discredited, and improper identification techniques not be used.

**Damages**

77.    As a direct result of the defendants' unconstitutional actions, Mr. Miller sustained the following injuries and damages: personal injuries; pain and suffering; severe mental anguish; emotional distress; loss of income; infliction of physical illness; inadequate medical care; humiliation, indignities and embarrassment; degradation; injury to reputation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom, such as diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

## CLAIMS

### Count I—42 U.S.C. § 1983
### Claims against Defendants Hill, Pishkin, and Daly
### for Unduly Suggestive Identification Procedures

78.    Plaintiff Miller hereby incorporates fully all of the foregoing as if set forth herein and further alleges as follows:

79.    Defendants Hill, Pishkin, and Daly conducted unduly suggestive identification procedures with Ms. Roe. This includes, without limitation, the following acts:

        A.    They conducted the initial photo array identification by showing Ms. Roe a six-year-old photo of a teen-age Neil Miller that looked nothing like his appearance in 1989, when the crime was committed.

B.   When Ms. Roe selected Mr. Miller's photograph first and then another photo, Defendant Hill suggested that Ms. Roe follow her "first impression," thus nudging her toward selecting Mr. Miller.

C.   Upon Mr. Miller's arrest, a new photo was taken, and a new photo array was made; Ms. Roe was permitted to identify him although Defendant Hill admitted that his appearance in this photo was dramatically different from his appearance in the first photo shown to Ms. Roe.

D.   At some point after Mr. Miller's arrest but before Ms. Roe testified at trial, Defendant Hill engaged in additional suggestive and improper conduct to convince Ms. Roe she had identified the right man, which included falsely telling Ms. Roe that Mr. Miller was a bad person who had previously raped a ninety-year-old woman.

E.   Ms. Roe was permitted to identify Mr. Miller though she had originally described her assailant as having brown hair—an unusual trait for an African-American man. Mr. Miller did not have brown hair.

F.   Defendants Pishkin and Daly conducted a suggestive show-up in the hallway outside the courtroom. The victim was not sure whether Mr. Miller was her assailant. Defendants Pishkin and Daly then immediately conducted a second show-up, permitting Ms. Roe to identify Mr. Miller while he was sitting alone in the almost empty

courtroom. Each violated Mr. Miller's right to counsel and deliberately ignored the specific pending application of Mr. Miller's counsel to avoid another suggestive identification.

80. Defendant Daly was acting in his investigative capacity when he helped arrange the hallway show-up identification.

81. The defendants committed these unduly suggestive acts intentionally and with deliberate indifference to Mr. Miller's clearly established constitutional rights. No reasonable officer or assistant district attorney would have believed that these procedures were lawful or would produce a reliable identification.

82. As a direct and proximate result of the defendants' use of unduly suggestive identification procedures, Ms. Roe misidentified Mr. Miller at trial in violation of his clearly established Fourteenth Amendment right to a fair trial and his right not to be deprived of liberty without due process of law. Mr. Miller suffered more than ten years of wrongful imprisonment, and he endured all of the other physical, emotional, and pecuniary damages set forth above.

**Count II—42 U.S.C. § 1983**
**Due Process Claims against Defendants Hill and Brody**
**for Failing to Disclose Evidence and for Fabricating Evidence, and**
**Due Process Claim Against Defendant Hill for Failure to Investigate.**

83. Plaintiff Miller hereby incorporates fully all of the foregoing as if set forth herein and further alleges as follows:

### A.    Fourteenth Amendment <u>Brady</u> Claims

84. Defendant Hill failed to disclose to the prosecutor and the defense attorney material information that was favorable to Mr. Miller. This undisclosed information included the fact that she repeatedly employed unduly suggestive conduct that induced Ms. Roe to misidentify Mr. Miller.

85. Defendant Brody also failed to disclose to the prosecutor material information that was favorable to Mr. Miller. This information included serology evidence that would have presumptively exculpated Mr. Miller in the rape.

86. Acting with deliberate indifference by withholding this material exculpatory and impeachment evidence prior to trial, Defendants Hill and Brody violated Mr. Miller's clearly established Fourteenth Amendment right to due process of law as interpreted by the United States Supreme Court in <u>Brady v. Maryland</u> and its progeny. This directly and proximately caused Mr. Miller to be wrongfully convicted and to suffer the injuries and damages described above.

## B.    Fabricating False Inculpatory Evidence

87.    On information and belief, Defendant Hill fabricated the claim that semen stains on the fitted sheet came from consensual sex between roommate Ms. Jones and a boyfriend.

88.    Defendant Brody fabricated inculpatory evidence by preparing a report before trial that omitted the exculpatory nature of the evidence taken as a whole and by falsely stating to the prosecutor that Mr. Miller was one of the less than 40% of men who could have contributed semen found on the swabs.

89.    As a direct and proximate result of Defendant Hill's and Defendant Brody's fabrication of this inculpatory evidence (violating Mr. Miller's clearly established Fourteenth Amendment due process rights including the right to a fair trial along with his Fourth Amendment right to be free from unreasonable seizures), Mr. Miller was wrongfully convicted and suffered the injuries and damages described above.

## C.    Failure to Investigate

90.    Defendant Hill deliberately and recklessly failed to investigate adequately, as any minimally competent officer would have, whether any male friend of Ms. Roe's roommate could have been the source of semen stains on Ms. Roe's fitted sheet by investigating the identities of any such male friends and by conducting elimination blood testing on them in order to exclude them and the roommate as potential sources for the stains on the sheet.

91. As a direct and proximate result of defendant Hill's failure to investigate, in violation of his clearly established Fourteenth Amendment rights, Mr. Miller was wrongfully convicted, and suffered the injuries and damages set forth above.

## Count III—42 U.S.C. § 1983
## Claims against Defendants Hill, Brody, Pishkin, and Daly
## for Malicious Prosecution

92. Plaintiff Miller hereby incorporates fully all of the foregoing as if set forth herein and further alleges as follows:

93. When Mr. Miller was arrested, the only inculpatory evidence was the unreliable identification by Ms. Roe, which was the result of police pressure rather than her own memory. Her misidentification did not provide probable cause to arrest him.

94. Defendants Hill, Brody, Pishkin, and Daly, all state actors acting under the color of law, commenced or caused to be commenced a criminal prosecution, instituted with malice and without probable cause, against Mr. Miller. They used improper, unduly suggestive techniques and they wrongfully pressured Ms. Roe into falsely identifying Mr. Miller as her rapist. They then failed to disclose material exculpatory evidence including that the identifications were conducted in an unduly suggestive manner and that serological evidence excluded Mr. Miller (contrary to the fabricated evidence presented to the prosecution).

95. The defendants acted to secure a conviction of Mr. Miller regardless of the evidence. They chose to ignore, fail to disclose, or misrepresent the evidence that indicated Mr. Miller's innocence.

96. The criminal action ultimately terminated in Mr. Miller's favor on May 10, 2000, when his conviction was vacated on the grounds of his actual innocence, due to the conclusive comparative DNA exoneration.

97. The defendants' conduct violated Mr. Miller's clearly established rights under the Fourth Amendment and the procedural due process component of the Fourteenth Amendment.

98. As a proximate result of the defendants' conduct, Mr. Miller was arrested, was prosecuted, was forced to endure an unfair trial and wrongful conviction, and was wrongly imprisoned for more than ten years. He suffered the injuries and damages set forth above.

## Count IV—42 U.S.C. § 1983
## <u>Monell</u> Claim against the City of Boston

99. Plaintiff Miller hereby incorporates fully all of the foregoing as if set forth herein and further alleges as follows:

100. By August 1989, the defendant City of Boston had a policy, custom, or practice of failing to properly discipline, supervise, and train Boston police officers including the individuals named in this case. The City failed to ensure that its police officers would conduct constitutionally adequate identification procedures; obtain probable cause to

ensure that suspects would not be falsely arrested and maliciously prosecuted; disclose to prosecutors material information favorable to criminal defendants; follow the duties imposed by Brady v. Maryland; and never fabricate inculpatory evidence.

101. These policies, customs, and practices led Boston police officers to believe that misconduct would be tolerated and that allegations of abuse of constitutional rights would not be investigated. They made it foreseeable that officers would violate people's constitutional rights.

102. The policies, customs, and practices of the Boston Police Department described in this complaint were the moving force behind Mr. Miller's arrest, prosecution, and incarceration.

### Count V—42 U.S.C. § 1983
### Supervisory Liability Claims against John Doe and Jane Doe,
### Supervisors in the Boston Police Department

103. Plaintiff Neil Miller hereby incorporates fully all of the foregoing as if set forth herein and further alleges as follows:

104. Unnamed defendant supervisors of the Boston Police Department, collectively referred to here as John Doe and Jane Doe, acting under color of law with deliberate indifference to the rights of criminal suspects, failed to train and supervise adequately Defendants Hill, Brody, and Pishkin. In so doing, these defendants tacitly acquiesced in, condoned, or encouraged the individual defendants' engaging in unconstitutional misconduct, including the use of unduly suggestive identification procedures, the

28

fabrication of evidence, and the suppression of exculpatory material evidence from the prosecutor.

105.   The failure of these defendants to supervise and train the named individual defendants amounted to deliberate indifference, or intentional misconduct, which proximately and directly caused Mr. Miller to suffer all of the injuries and damages set forth above.

## Count VI—42 U.S.C. § 1983
## Monell Claims against Defendants Suffolk County
## and the Suffolk County District Attorney's Office
## for Failure to Train and Supervise Prosecutors

106.   Plaintiff Miller hereby incorporates fully all of the foregoing as if set forth herein and further alleges as follows:

107.   Defendants Suffolk County and the Suffolk County District Attorney's Office, by and through their policymakers, created and maintained a policy, custom, or practice of failing to train and supervise their employees and agents, including Defendant Daly, in conducting constitutionally adequate identification procedures and in ensuring that unreliable, discredited, and improper identification techniques not be used.

108.   This failure to train and supervise directly and proximately caused Mr. Miller to suffer constitutional deprivations and thus caused the injuries and damages set forth above.

## Count VII—State Tort Law
## Claims against Defendants Hill, Brody, Pishkin, and Daly
## for Malicious Prosecution

109. Plaintiff Miller hereby incorporates fully all of the foregoing as if set forth herein and further alleges as follows:

110. Defendants Hill, Brody, Pishkin, and Daly commenced or caused to be commenced a criminal prosecution against Mr. Miller, acting with malice and without probable cause. They used improper and unduly suggestive techniques and they wrongfully pressured Ms. Roe into falsely identifying Mr. Miller as her rapist. They then failed to disclose material exculpatory evidence, including that the identifications were conducted in an unduly suggestive manner and that serological evidence excluded Mr. Miller (contrary to fabricated evidence presented to the prosecution).

111. The criminal action ultimately terminated in Mr. Miller's favor on May 10, 2000, when his conviction was vacated on the grounds of actual innocence, due to the conclusive comparative DNA exoneration.

112. As a proximate result of the defendants' conduct, Mr. Miller was arrested, prosecuted, forced to endure an unfair trial and wrongful conviction, and wrongly imprisoned for more than ten years. He suffered the injuries and damages set forth above.

## CLAIMS FOR DAMAGES

113. The defendants' actions deprived Mr. Miller of his civil rights under the First, Fourth, Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and under the laws of the Commonwealth of Massachusetts.

114. The defendants' unlawful, intentional, willful, purposeful, deliberately indifferent, reckless, bad-faith, and malicious acts, misdeeds, and omissions caused Mr. Miller to be falsely arrested, maliciously prosecuted, unfairly tried, wrongfully convicted, and wrongfully imprisoned for more than ten years, together with all of the other injuries and damages set forth above.

115. All the alleged acts, misdeeds, and omissions committed by the defendants described herein for which liability is claimed were done intentionally, willfully, purposefully, knowingly, unlawfully, maliciously, wantonly, recklessly, or with bad faith. The proscribed conduct of the individual defendants meets all of the standards for imposition of punitive damages.

**WHEREFORE,** Neil Miller prays as follows:

A.     That the court enter judgment in favor of Mr. Miller and against the defendants on all Counts of the Complaint;

B.     That the court award compensatory damages to Mr. Miller and against the defendants, jointly and severally, in an amount to be determined at trial;

31

C. That the court award punitive damages to Mr. Miller and against the non-municipal defendants, jointly and severally, in an amount to be determined at trial, in order that such an award will deter similar proscribed conduct in the future;

D. That the court award to Mr. Miller and against the defendants, jointly and severally, pre-judgment and post-judgment interest on all sums awarded him in this action;

E. That the court award to Mr. Miller and against the defendants, jointly and severally, recovery of his costs concerning this action, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

F. That the court grant Mr. Miller any such other relief to which he may be entitled.

**RESPECTFULLY SUBMITTED,**

NEIL MILLER

By his attorneys,

*Peter J. Neufeld*

Peter J. Neufeld
Brandon L. Garrett
Cochran Neufeld & Scheck LLP
99 Hudson St., 8th Floor
New York, NY 10013
Tel: (917) 237-0338
Fax: (212) 965-9084

*Howard Friedman*

Howard Friedman
BBO #180080
Myong J. Joun
BBO #645099
Law Offices of Howard Friedman
90 Canal Street, 5th Floor
Boston, MA 02114-2022
Tel: (617) 742-4100
Fax: (617) 742-5858

Dated: May 1, 2003
Exhibit 1: DNA Report (victim's name redacted)



April 21, 2000

Jane Siegel Greene, Esq.
Peter Neufeld, Esq.
Barry Scheck, Professor
The Innocence Project
99 Hudson St., 8th Floor
New York, NY, 10013

Re: Massachusetts v. Neil Miller
On Habeas Corpus
Our File No. 99-597

## Report

### Background

The following information was communicated to us by Elliot Adler and Peter Neufeld, counsel for Neil Miller: The Miller case involves a sexual assault in which the victim is        a Caucasian female; and the suspect is Neil Miller. On or about August 24, 1989, a Black male entered the       apartment in Boston, Massachusetts, and raped     on her roommate's bed. The assailant also forced her to perform oral intercourse on him; and he robbed the apartment.

A sexual assault kit was collected from      together with bedding from the apartment. These items were later examined by David Brody of the Boston Police Department Crime Laboratory. Brody identified several large semen stains on the bed sheet; and he also identified spermatozoa on the vaginal and genital swabs. ABO blood group typing of these

specimens revealed that the semen from the sheet originated from an ABO type B secretor. Both _____ and Miller were determined to be ABO type O secretors. Thus, the semen from the sheet could not have originated from Miller. ABO blood group typing from the vaginal and genital swabs revealed only the ABO type O [H] blood group substance. This analysis was logically uninformative because all of the H blood group substance could have originated from the female victim herself without revealing any information about the semen source. For example, the B blood group substance from the semen may not have been detected in the vaginal or genital swab samples because the semen was diluted by the victim's vaginal secretions which contain only the O [H] blood group substances.

Despite this physical evidence, the in court eye witness identification of Miller by _____ lead to his conviction at trial on December 19, 1990. Upon conviction Miller was sentenced to 26 to 45 years in prison. Miller maintained at trial as he does now, that he was the victim of a false eye witness identification. He now seeks post conviction testing of semen evidence recovered from _____ vagina and her roommate's bed sheet. It was requested that PCR based DNA typing of STR genes be conducted to determine whether or not Miller can be eliminated as the source of spermatozoa from the physical evidence recovered from _____ and her apartment.

## Items of Physical Evidence

The following items of physical evidence were received from Melissa Thompson of Cellmark Diagnostics, Germantown, Maryland, on December 7, 1999, via Federal Express mail:

### Item

1. Tape sealed envelope marked "Boston Police Department 89345 Whole Blood _____ 11/14/90 portion sent to Cellmark 11/8/99" containing a similarly marked tape sealed glassine paper bindle containing similarly marked bloodstained cloth.

2

2. Tape sealed envelope marked "Boston Police Department 89345 Whole Blood Neil Miller 10-31-90 portion sent to Cellmark 11/8/99" containing a similarly marked tape sealed glassine paper bindle containing similarly marked bloodstained cloth.

3. Tape sealed envelope marked "Boston Police Department 89345 Item #7 Sheet stain #1 portion sent to Cellmark 11/8/99" containing a tape sealed glassine paper bindle marked "89345 I7 stain #1" containing stained white cloth.

4. Tape sealed envelope marked "Boston Police Department 89345 Item #7 Sheet control 11/8/99" containing a tape sealed glassine paper bindle marked "89345 I7 sheet control" containing apparently unstained white cloth.

5. Tape sealed envelope marked "Boston Police Department 89345 Item 10B Vaginal swab sent to Cellmark 11/8/99" containing a tape sealed glassine paper bindle marked "89345 vag swab #1" containing a partial swab.

6. Tape sealed envelope marked "Boston Police Department 89345 Item 10B genital swab sent to Cellmark 11/8/99" containing a tape sealed glassine paper bindle marked "89345 gen swab #1" containing a partial swab.

# Examination of the Bed Sheet Cutting [Item 3]

A piece of bed sheet fabric #7-1 [Item 3] obtained from the bed upon which                    was raped was submitted for examination. This bedding fabric is illustrated in figure 1. Yellowed stain material covers most of this fabric surface. Less than half of this stained material was removed and extracted. The removed section of fabric is illustrated in figure 2. Microscopic examination of the cellular debris revealed enormous quantities of

spermatozoa and only a low level of epithelial cells. DNA was extracted from this specimen as described below.

An unstained piece of bed sheet fabric #7 [Item 4] was also submitted for examination. This fabric material is illustrated in figure 3. Fabric approximately 1 cm² was removed from this sheet cutting and extracted. Microscopic examination of the cellular debris revealed a low level of epithelial and dermal cells. DNA was extracted from this specimen as described below.

## Examination of the Vaginal Swab from        #10B [Item 5]

A partial vaginal swab from        #10B [Item 5] was submitted for examination. This swab is illustrated in figure 4. Approximately half of the remaining swab tip was removed and extracted. Microscopic examination of the cellular debris revealed a moderate number of spermatozoa and numerous epithelial cells. DNA was extracted from this specimen as described below.

## Examination of the        Genital Swab #10B [Item 6]

A partial genital swab from        #10B [Item 6] was submitted for examination. This swab is illustrated in figure 5. Approximately half of the remaining swab tip was removed and extracted. Microscopic examination of the cellular debris revealed numerous spermatozoa and epithelial cells. DNA was extracted from this specimen as described below.

## Genetic Analysis of DNA

Several genes were amplified using the polymerase chain reaction [PCR] and subsequently typed. These genes include the STR genes known as Profiler Plus [D3S1358, vWA, FGA, D8S1179, D21S11, D18S51, D5S818, D13S317, D7S820]; and amelogenin, a gene that allows sex determination.

D3S1358, vWA, FGA, D8S1179, D21S11, D18S51, D5S818, D13S317, and D7S820 are short tandem repeat [STR] genes. These genes are composed of tandemly repeated units of a core DNA segment where the difference between different alleles is determined by the number of core repeated units contained within the allele. The typical size of the core unit for an STR gene is on the order of four base pairs [bp]. The primers that recognize particular STR genes can be labeled with a fluorescent dye so that the alleles can be detected and quantitatively assessed after electrophoresis.

These STR genes can be grouped so that several gene systems can be typed simultaneously from one analysis. For example, nine STR genes [D3S1358, vWA, FGA, D8S1179, D21S11, D18S51, D5S818, D13S317, D7S820] and amelogenin] are grouped together in a typing system called Profiler Plus. For those genes which employ a D_S_ nomenclature, the number following the "D" designation indicates the human chromosomal location of the gene locus. Some of these genes employ a different nomenclature determined by their discoverers. For example, the following STR genes are in this category: The vWA gene is located on chromosome 12. The FGA gene is located on chromosome 4.

The amelogenin gene is located on the sex determining X and Y chromosomes. Amelogenin is a gene responsible for the synthesis of a protein associated with fetal tooth bud development. A portion of this gene on the X chromosome contains a 6 bp deleted DNA segment allowing this region of the X chromosome to be distinguished from the corresponding region of the Y chromosome by size. Since females possess two X chromosomes and males possess an X and a Y chromosome, the sex of a specimen source can be determined by examining this DNA region using electrophoresis.

Genetic analysis of the specimens in this case involved the following essential steps:

1. Epithelial cells were digested with SDS and proteinase K followed by digestion of spermatozoa with SDS, proteinase K, and DTT [dithiothreitol]. Blood was digested with SDS and proteinase K.

2. DNA was extracted from sample digests with chloroform/phenol and concentrated using Centricon molecular filters.

3. The various genes described above were amplified using the Polymerase Chain Reaction [PCR].

4. The STR genes and amelogenin were typed using capillary electrophoresis.

The results of this analysis are summarized in Table 1. These findings revealed the following observed facts:

## Reference Samples

1. was determined to be D3S1358 type **17,19**; vWA type **15,17**; FGA type **22,24**; D8S1179 type **10,12**; D21S11 type **29,30**; D18S51 type **14,17**; D5S818 type **13,13**; D13S317 type **8,12**; and D7S820 type **10,11**. This DNA was also determined to originate from a **female** by analysis of the amelogenin gene.

2. <u>Neil Miller</u> was determined to be D3S1358 type **15,16**; vWA type <u>**15,19**</u>; FGA type <u>**22,25**</u>; D8S1179 type <u>**12,13**</u>; D21S11 type <u>**28,30**</u>; D18S51 type <u>**15,16**</u>; D5S818 type <u>**10,11**</u>; D13S317 type <u>**12,13**</u>; and D7S820 type <u>**7,11**</u>. This DNA was also determined to originate from a **male** by analysis of the amelogenin gene.

## Semen Evidence

3. The spermatozoa recovered from the _____ [or roommate] bed sheet cutting #7-1 [Item 3] was determined to be D3S1358 type 15,16; vWA type 16,17; FGA type 23,25; D8S1179 type 12,17; D21S11 type 27,28; D18S51 type 16,19; D5S818 type 12,12; D13S317 type 12,14; and D7S820 type 8,12. This DNA was also determined to originate from a male by analysis of the amelogenin gene. This array of genotypes occurs in significantly less than one out of 100,000 members of the population. The calculated genotype frequencies indicate that it is unlikely that more than one human being has ever possessed this particular genotype array. The frequencies associated with individual genotypes are summarized in Appendix 1 below.

4. The spermatozoa recovered from the _____ vaginal swab #10B [Item 5] was determined to be D3S1358 type 15,16; vWA type 16,17; FGA type 23,25; D8S1179 type 12,17; D21S11 type 27,28; D18S51 type 16,19; D5S818 type 12,12; D13S317 type 12,14; and D7S820 type 8,12. This DNA was also determined to originate from a male by analysis of the amelogenin gene.

5. The spermatozoa recovered from the _____ genital swab #10B [Item 6] was determined to be D3S1358 type 15,16; vWA type 16,17; FGA type 23,25; D8S1179 type 12,17; D21S11 type 27,28; D18S51 type 16,19; D5S818 type 12,12; D13S317 type 12,14; and D7S820 type 8,12. This DNA was also determined to originate from a male by analysis of the amelogenin gene.

6. The spermatozoa recovered from the _____ [or roommate] bed sheet stain [Item 3], the _____ vaginal swab [Item 5], and the _____ genital swab [Item 6] originate from the same male individual.

7. <u>Neil Miller is eliminated</u> as the source of spermatozoa from the [or roommate] bed sheet stain [Item 3], the        vaginal swab [Item 5], and the        genital swab [Item 6] because the genotypes possessed by Miller differ from those possessed by the sperm source at 8 out of the 9 genetic marker loci examined in this scientific investigation.  The genotypes possessed by Miller which are different than those possessed by the sperm source are underlined in red in ¶ 2 above.

8. The background cutting from the        [or roommate] bed sheet contains female cellular material that does not originate from        .  This cellular material may originate from her female roommate(s).

Should you have any questions concerning this work, please contact us.

Sincerely,

Edward T. Blake, D.Crim.

Alan Keel, Criminalist